# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| RENEE MIDDLETON, | : | | |
| | : | | |
| Plaintiff. | : | Civil Action No.: | 17-88 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 10, 12 |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.* | : | | |
| | : | | |
| | : | | |
| Defendants. | : | | |

## <u>MEMORANDUM OPINION</u>

### Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment; Granting in Part and Denying in Part Defendant's Cross-Motion for Summary Judgment

## I. INTRODUCTION

Plaintiff Renee Middleton appeals from a final administrative decision that partly rejected her claim that District of Columbia Public Schools ("DCPS") violated the Individuals with Disabilities Education Act ("IDEA") by failing to provide her son A.T. with a free appropriate public education. Before the Court are the parties' cross-motions for summary judgment. Finding that DCPS fell short of meeting its obligations under the IDEA—primarily by virtue of its unilateral decision to place A.T. in programming inappropriate for his capabilities and needs, a root-deep error that marred other aspects of the formation and implementation of A.T.'s IEPs —the Court grants in part and denies in part both parties' motions and remands this case to the hearing officer for further proceedings consistent with this Opinion.

## II. BACKGROUND

### A. Statutory Framework

By enacting the IDEA, Congress sought to protect the rights of children with disabilities and parents of such children and to "ensure that all children with disabilities have available to them a free appropriate public education." 20 U.S.C. § 1400(d)(1)(A), (B). A free appropriate public education, or FAPE, includes "special education" (defined by the Act as "specially designed instruction . . . to meet the unique needs of a child with a disability") and "related services" (defined as "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education"). *Id.* § 1401(9), (26), (29). Special education and related services must also "meet the standards of the State educational agency." *Id.* § 1401(9)(B).

Children determined eligible for special education and services under the IDEA receive an "individualized educational program," or IEP. *Id.* § 1401(9)(D), (14). "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist., RE–1*, 137 S. Ct. 988, 994 (2017) (quoting *Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181 (1982)). Prepared by an "IEP Team"—composed of the child's parents or guardians, the child's teacher, a representative of a local educational agency, and, whenever appropriate, the child, 20 U.S.C. § 1414(d)(1)(B)—the IEP sets out the child's present academic and functional performance, establishes measurable academic and functional goals for the child, and states the special education and related services that will be provided for the child. *Id.* § 1414(d)(1)(A). For children who are sixteen years old or older, the IEP must also include "appropriate measurable postsecondary goals based upon age appropriate transition assessments" and an

explanation of the transition services necessary to assist the child in reaching those goals. *Id.* § 1414(d)(1)(A)(i)(VIII). The IEP Team reviews the child's IEP at least annually. *Id.* § 1414(d)(4)(A)(i). And the IEP Team may revise the IEP as appropriate to address the child's anticipated needs, any lack of expected progress toward annual goals, and other matters. *Id.* § 1414(d)(4)(A)(ii). At a minimum, the IEP must be "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. Additionally, the IDEA requires that "to the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled." 20 U.S.C. § 1412 (a)(5)(A). Courts in this jurisdiction have concluded that an IEP Team is required to discuss a student's specific "Least Restrictive Environment" ("LRE") and that the IEP is required to include at least a brief description of the child's LRE. *Brown v. District of Columbia*, 179 F. Supp. 3d 15, 26–28 (D.D.C. 2016).

"[A]ware that schools had all too often denied [children with disabilities] appropriate educations without in any way consulting their parents, Congress repeatedly emphasized throughout the Act the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness." *Honig v. Doe*, 484 U.S. 305, 311 (1988). To that end, the IDEA establishes procedural safeguards that provide parents with "both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Id.* at 311–12. Furthermore, the IDEA provides only baseline standards. *See Rowley*, 458 U.S. at 200. States may afford additional procedural and substantive protections, so long as those requirements are not inconsistent with the IDEA. *See G. ex rel. Ssgt RG v. Fort Bragg Dependent Schs.*, 324 F.3d 240, 249 (4th Cir. 2003). In that vein, the District of Columbia—which is a State for purposes of

the IDEA, 20 U.S.C. § 1401(31)—offers some procedural safeguards that exceed the federal standards. *See, e.g.*, D.C. Code § 38-2571.03. Notably, "[i]f state legislation implementing IDEA creates a higher standard than the federal minimum, an individual may bring an action under the federal statute seeking to enforce the state standard." *Gill v. Columbia 93 Sch. Dist.*, 217 F.3d 1027, 1035 (8th Cir. 2000); *see also* 20 U.S.C. § 1401(9) (defining a FAPE as, among other things, special education and related services that "meet the standards of the State educational agency").

A parent may lodge a due process complaint to challenge the school district's provision of a FAPE based on either procedural or substantive violations of the IDEA and may demand an "impartial due process hearing." 20 U.S.C. § 1415 (b)(6), (f)(1). At that hearing, the parties may present evidence and elicit expert testimony about the child's educational and functional needs. *Id.* § 1415(f), (h). After the hearing, the independent hearing officer ("IHO") issues a decision (the "HOD"), evaluating whether the school district denied the student a FAPE and, if so, describing any appropriate remedy. *See id.* § 1415(f)(3)(E); *see also B.D. v. District of Columbia*, 817 F.3d 792, 798 (D.C. Cir. 2016). A parent aggrieved by the decision may seek review in the appropriate federal district court. 20 U.S.C. § 1415(i)(2).

### B. Factual Background

A.T., who was born in 2000 and who resides in the District of Columbia, is considered a "child with a disability" under the IDEA. Def.'s Statement of Material Facts Not in Dispute ("Def.'s SMFND") ¶¶ 1–11, ECF No. 13-2; Pl.'s Statement of Material Facts Not in Dispute ("Pl.'s SMFND") ¶ 1, ECF No. 10-2; s*ee* 20 U.S.C. § 1401(3)(A). For the 2014–2015 school year—A.T.'s eighth grade year—he was enrolled at Sousa Middle School ("Sousa"). Def.'s SMFND ¶ 19. At Sousa, A.T. was placed in a full-time, self-contained class of eleven students,

where he participated in programming geared toward low functioning students with communication and other cognitive and achievement deficits. Pl.'s SMFND ¶¶ 2–6. The students in A.T.'s class had limited interactions with their non-disabled peers and traveled in a group with an aide any time that they needed to move to other locations in the building. Pl.'s SMFND ¶ 4.

When A.T.'s eighth grade year was coming to a close, some members of his IEP Team—specifically, a special education teacher, a school representative and assessment evaluator, a general education teacher, and a speech pathologist, *see* IEP 4/24/2015, Admin. R. at 343, ECF No. 7-4—convened to revise his IEP in anticipation of his transition to high school. *See* Pl.'s SMFND ¶¶ 8–10; Def.'s SMFND ¶ 20; IEP 4/24/2015, Admin. R. at 343–62. However, neither A.T.'s mother Renee Middleton nor the family's educational advocate Dr. Ida Jean Holman was notified of the meeting and neither attended it. *See* Pl.'s SMFND ¶¶ 9–10; Testimony of Ida Jean Holman ("Holman Tr."), Admin. R. at 1287–88, ECF No. 8-5. Indeed, on May 4, 2015, Dr. Holman requested a meeting to review A.T.'s progress, and received no indication that the school had already conducted its annual IEP review meeting. Holman Tr., Admin. R. at 1288; Email from Dr. Ida Jean Holman to Nicola Stewart, Admin. R. at 120. The record contains no notes from the April 2015 IEP meeting. *See* Hearing Officer Determination ("HOD"), Admin. R. at 10; Holman Tr., Admin. R. at 1288.

The IEP developed at the April 2015 meeting listed A.T. as having multiple disabilities, including Speech-Language Impairment. IEP 4/24/2015, Admin. R. at 343. Consistent with his past IEPs, it also documented A.T.'s struggles with mathematics, reading, and writing. At the time that the IEP was written, A.T.'s standardized test scores in all of those areas fell within the "very low range." IEP 4/24/2015, Admin. R. at 345–48. In mathematics, for example, A.T.

performed at the 1.1 grade-level equivalent; in reading, A.T's assessment stated that "he is unable to read due to an inability to blend phonetic sounds along with severe memory retention problems." IEP 4/24/2015, Admin. R. at 347. Furthermore, various evaluations revealed that A.T. had low cognitive functioning. IEP 4/25/2015, Admin. R. at 349. The April 2015 IEP indicated that A.T.'s various "deficit[s] and his extreme struggles with memory retention prevent him from being able to access the general education curriculum at the 7th grade level"—a reference to a grade lower than A.T.'s—and noted that A.T. "require[d] constant assistance, significant modifications and differentiation to access curriculum that is significantly below grade level" in mathematics, reading, and writing. IEP 4/24/2015, Admin. R. at 345–48.

A.T.'s April 2015 IEP called for 27 hours per week of specialized instruction outside of the general education setting. IEP 4/24/2015, Admin. R. at 352. A.T. would also receive 120 minutes per month—30 minutes per week—of speech-language services. IEP 4/24/2015, Admin. R. at 352. This amounts to a full-time placement in a special education setting. The IEP acknowledged that A.T. would "benefit from the use of assistive technology for learning," and explained that A.T. had "been provided an iPad with various programs for academic use." IEP 4/24/2015, Admin. R. at 352. With respect to other services, A.T. was deemed eligible for special education transportation to and from school and for Extended School Year ("ESY") programming. IEP 4/24/2015, Admin. R. at 356.

The April 2015 IEP also described a post-secondary transition plan for A.T. *See* IEP 4/24/2015, Admin. R. at 359–62. According to the document, A.T. expressed an academic interest in science and employment interests in truck driving or in "using a cash register, working from 9-5 and keeping detailed reports." IEP 4/24/2015, Admin. R. at 359. Upon graduation from high school, A.T. would "attend a job training program for a job of his choice." IEP

4/24/2015, Admin. R. at 359. To prepare A.T. for post-secondary education and training, the IEP stated that, within the year, A.T. would use the internet to identify four different locations that offer information on job training programs. He would also map out how and when he would visit each location and would present a plan to his case manager. IEP 4/24/2015, Admin. R. at 360. To prepare A.T. for post-secondary employment, A.T. would identify traits consistent with individuals who are employed in a 9–5 career, and he would document the knowledge, skills, and abilities necessary to have a successful career in a 9–5 position. IEP 4/24/2015, Admin. R. at 360. Afterward, he would present his findings to his case manager. The IEP listed A.T.'s post-secondary employment goal as to "be employed" upon graduation from high school. IEP 4/24/2015, Admin. R. at 360. Finally, A.T.'s April 2015 IEP listed his "projected exit category" as "H.S. Diploma," rather than either "H.S. Certificate prior to age 21" or "H.S. Certificate at age 21." IEP 4/24/2015, Admin. R. at 362.

During the summer before A.T.'s ninth grade year, the special education coordinator at Sousa advised Ms. Middleton that she should enroll A.T. at Woodson Senior High School ("Woodson"), A.T.'s neighborhood school—a decision apparently made "downtown" rather than by any members of A.T.'s IEP Team. Pl.'s SMFND ¶ 25; Holman Tr., Admin. R. at 1290–91. However, the special education coordinator did not provide Ms. Middleton or Dr. Holman with any further information about A.T.'s placement or about the programming in which he would be enrolled in high school, despite repeated requests for such information.[1] *See* Pl.'s SMFND ¶¶ 24–25. Nevertheless, Ms. Middleton enrolled A.T. at Woodson. Pl.'s SMFND ¶ 25. After A.T.

_____

[1] According to Dr. Holman, Ms. Middleton did not receive the Location of Services letter, which clarified that A.T. would be enrolled in the Specific Learning Support ("SLS") program at Woodson. New Location for Special Education Services for [Redacted] for School Year 2015–2016, Admin. R. at 363.

arrived at Woodson—an arrival delayed several days by confusion about whether Woodson was in fact the school to which A.T. had been assigned, *see* Email from Ida Jean Holman to Lloyd Bryant (Aug. 27, 2015), Admin. R. at 121–23—Dr. Holman continued to request information about A.T.'s programming and asked for a 30-day review meeting to assess A.T.'s adjustment to the new school. *See* Admin. R. at 124–28. Several of Dr. Holman's emails went unanswered, and Ms. Middleton received no immediate clarification about A.T.'s programming. *See* Admin. R. at 124–28. In September and October 2015, through her educational advocate, Ms. Middleton communicated concerns that A.T. had reportedly been absent from several classes and had been spending "a majority of his days wandering the halls of Woodson." Admin. R. at 124–25, 128.

On October 19, 2015, Ms. Middleton and her educational advocate met with Woodson school officials. During that meeting, Ms. Middleton apparently learned that A.T. was enrolled in the "diploma track" and that he was taking four "core" courses. *See* Meeting Notes, 10/19/2015, Admin. R. at 378, ECF No. 7-4. She also learned that he was taking, among other things, two general education classes—Music and Physical Education—and an inclusion-style, twenty-five student World History class, from which A.T. was periodically removed for specialized instruction in a smaller group of about seventeen students. *See* Meeting Notes, 10/19/2015, Admin. R. at 378. At the meeting, Ms. Middleton and Dr. Holman also purportedly mentioned their concerns that Woodson was not properly implementing A.T.'s IEP. Pl.'s SMFND ¶ 37. Days later, Dr. Holman sent a follow-up letter to Woodson's special education coordinator, detailing concerns—namely, that A.T. was enrolled in two general education courses even though his IEP called for full-time special education programming, that his mathematics and English placements did not seem suited for his level of skill or ability, that A.T. was not consistently receiving one-to-one instruction, that A.T. had not been given an iPad or

other assistive technology, that A.T. was consistently failing to eat during his assigned lunch period, that A.T.'s behavioral plan was not properly suited to reduce his anxiety, and that A.T. went from placement in a self-contained class at Sousa to placement in an integrated program at Woodson without any attention to Ms. Middleton's views on the matter. *See* Letter from Dr. Holman to Ms. Lumumba-Umoja, (Oct. 23, 2015), Admin. R. at 134–36.

The next month, Dr. Holman wrote to Woodson's special education coordinator to schedule a time to observe A.T. at school. *See* Letter from Dr. Holman to Ms. Lumumba-Umoja (Nov. 9, 2015), Admin. R. at 140. The coordinator explained that in order to secure approval for such a visit, Ms. Middleton would have to submit a parental consent form and Dr. Holman would have to identify the focus of her proposed observation and submit a signed observer confidentiality agreement. *See* Admin. R. at 141–52. Insisting that several provisions of the confidentiality agreement violated District of Columbia law, Dr. Holman refused to sign, even after an attorney for DCPS suggested that Dr. Holman could sign the form, indicate that she had signed it "under protest," and could "specify" any provision that she believed violated the law. *See* Admin. R. at 148–52. Because Dr. Holman would not sign the agreement, she was not permitted to observe A.T. in school. *See* HOD, Admin. R. at 30 (listing issue as "[w]hether DCPS denied [A.T.] a FAPE by preventing Parent's expert from observing [him] in his current placement").

Over the next few months, Dr. Holman reiterated concerns about A.T.'s programing, A.T.'s attendance issues, and Woodson's implementation of A.T.'s IEP. *See* Admin. R. at 153–62. During that same period, school officials apparently repeatedly ignored Dr. Holman's several requests for A.T.'s school records. *See* E-mail from Dr. Holman to Ms. Lumumba-

Umoja, Admin. R. at 162 (noting that the email constituted "the fourth or fifth" request "for the same records").

In February 2016, A.T.'s IEP Team met to revise his IEP. *See* IEP 2/9/2016, Admin. R. at 461. Like A.T.'s April 2015 IEP, his February 2016 IEP indicated that he is multiply disabled and that he has deficits in writing, reading, and mathematics. *See* IEP 2/9/2016, Admin. R. at 462–69. According to his February 2016 IEP, "[w]ith consistent prompting, enlistment, small group instruction and discussion, [A.T.] will attempt daily classroom assignments after instructions are given." IEP 2/9/2016, Admin. R. at 463. And "when taught in a one-on-one capacity or a very small group, [A.T.] is able to correctly complete . . . task[s] with fading instructional support, modeling and extended time." IEP 2/9/2016, Admin. R. at 463. However, "[w]hen there is limited prompting or [A.T.] is expected to complete [a] task independently, he had episodes of becoming confused and often ceased from attempting to complete the assignment[s]. IEP 2/9/2016, Admin. R. at 463. A Functional Behavioral Assessment completed in late February 2016 echoed these concerns and hypothesized that A.T. is most likely to remain on task and to participate in the academic environment when he has an established rapport with the staff, when he feels confident in his ability to do his work, and when he is in a small, structured classroom. *See* Pl.'s SMFND ¶¶ 70–74.

The February 2016 IEP called for 25 hours per week of specialized instruction (2 hours per week fewer than A.T.'s previous IEP) and 120 minutes per month of speech language pathology. IEP 2/9/2016, Admin. R. at 472–73. It also noted that A.T. would "benefit from the use of assistive technology for learning." IEP 2/9/2016, Admin. R. at 472. As in A.T.'s previous IEP, A.T. was deemed eligible for transportation services. IEP 2/9/2016, Admin. R. at 476. However, A.T. was deemed ineligible to participate in ESY programming. IEP 2/9/2016,

Admin. R. at 476.  The post-secondary transition plan included in A.T.'s February 2016 IEP

listed his academic interest as "art/drawing," and his employment interest as "to work for United

Parcel Service."  IEP 2/9/2016, Admin. R. at 477.  A.T.'s post-secondary education and training

goal remained to attend "a job training program for a job of his choice."  IEP 2/9/2016, Admin.

R. at 478.  To work toward that goal, by February 2017, A.T. was to identify at least two job

training programs of interest to him.  IEP 2/9/2016, Admin. R. at 478.  According to the IEP,

A.T.'s employment goal upon graduation was to "seek employment in an occupation of interest

to him."  IEP 2/9/2016, Admin. R. at 479.  By February 2017, he was to identify two or three

career interests and the requirements for those careers to make progress toward his goal.  IEP

2/9/2016, Admin. R. at 479.  Finally, the February 2016 IEP kept A.T. on the diploma track.  IEP

2/9/2016, Admin. R. at 481.

Shortly after the February 2016 IEP meeting, Dr. Holman sent a follow-up message,

which sought clarity regarding whether all of A.T.'s classes were self-contained.  Letter, Admin.

R. at 173–75.  Dr. Holman also expressed concern that Woodson had no plan in place to

remediate A.T.'s reading difficulties; explained that A.T.'s writing and mathematics goals

appeared to be beyond his abilities and that his reading goals were too vague to be effective; and

offered that A.T.'s behavioral and attendance issues likely resulted from the inappropriateness of

A.T.'s IEP and placement and his difficulties understanding his assignments.  Letter, Admin. R.

at 173–75.  Dr. Holman recommended that Woodson place A.T. in smaller classes and in a self-

contained program.  Letter, Admin. R. at 174.

At the end of 2015–16 school year, A.T. was not promoted to the next grade because he

failed three courses—Biology, Employability Skills, and Physical Education.  Pl.'s SMFND ¶

86. A.T.'s school records indicated that he had logged 57 absences during the school year.[2] Pl.'s SMFND ¶ 86.

In July 2016, Ms. Middleton filed an administrative complaint on behalf of her son. *See* Admin. Compl., Admin. R. at 611–65. In it, she contended that DCPS had denied A.T. a FAPE by failing to provide him with an appropriate IEP in April 2015. *See* Admin. R. at 634–44. Ms. Middleton argued that A.T.'s April 2015 IEP was inappropriate because it (1) placed him on the diploma track, (2) focused on common core grade-level standards rather than functional and daily living skills, (3) contained an inappropriate transition plan, and (4) failed to include information about the appropriate placement for A.T. and about the least restrictive environment in which he could be educated. Admin. Compl., Admin. R. at 634–44. Ms. Middleton also asserted that DCPS had denied A.T. a FAPE by changing his educational placement from a small, self-contained class at Sousa to a placement that required additional independent transitions and by failing to provide all of A.T.'s specialized instruction hours outside of the general education setting. Admin. Compl., Admin. R. at 644–51. In addition, Ms. Middleton complained that Woodson had not taken appropriate actions to address A.T.'s disability-related attendance issues and that the school had placed unreasonable and unlawful conditions on A.T.'s educational advocate's ability to observe A.T. in his educational placement. Admin. Compl., Admin. R. at 651–57. Finally, Ms. Middleton asserted that A.T.'s February 2016 IEP was also inappropriate because, it (1) reduced his allotted special education instructional hours, (2) continued his placement on the diploma track, (3) focused on common core grade-level standards rather than functional and daily living skills, (4) contained an inappropriate transition plan, (5)

---

[2] On several of the days on which A.T. was marked absent, he attended some classes, but missed others. *See* Pl.'s SMFND ¶ 86.

failed to include information about the appropriate placement for A.T. and about his LRE, and (6) deemed A.T. ineligible for ESY, even though he had qualified in the past and appeared to remain qualified for such programming. Admin. R. at 657–63.

After a three-day hearing in October 2016—during which the hearing officer heard testimony from Dr. Holman, Woodson's special education coordinator, two of A.T.'s teachers, experts in school placements and transition planning, and others—the IHO denied most of Ms. Middleton's claims, but granted a small number of them. *See* HOD, Admin. R. at 21–32. Notably, the hearing officer declined to find a violation of the IDEA due to A.T.'s placement on the diploma track. *See* HOD, Admin. R. at 24. But the hearing officer also declined to resolve whether A.T.'s placement on diploma track was appropriate, instead ordering A.T.'s IEP Team to meet with Ms. Middleton to discuss whether to shift A.T. to the certificate track. HOD, Admin. R. at 24.

The IHO agreed with Ms. Middleton that, with regard to the April 2015 IEP, DCPS had denied A.T. a FAPE by failing to include A.T.'s LRE on the IEP. HOD, Admin. R. at 27–28. The IHO also found that DCPS had changed A.T.'s placement from a self-contained program at Sousa to a larger environment at Woodson. HOD, Admin. R. at 26. However, the IHO concluded that A.T.'s placement at Woodson was nonetheless reasonably calculated to enable him to achieve educational benefit and, thus, was appropriate. HOD, Admin. R. at 26–27. Still, the IHO explained that DCPS had violated IDEA procedures and had denied A.T. a FAPE by failing to involve A.T.'s parent in the decision to place A.T. in the SLS program at Woodson. HOD, Admin. R. at 27. Finally, with respect to A.T.'s February 2016 IEP, the IHO noted that DCPS had acknowledged that it erred in removing A.T. from ESY programming and in reducing the number of specialized instruction hours listed on his IEP. HOD, Admin. R. at 33–34.

According to the IHO, the removal from ESY programming denied A.T. a FAPE, but the error in listing the number of specialized instruction hours did not because A.T. actually received the appropriate number of hours. *See* HOD, Admin. R. at 31–32. In all other respects, the IHO found no denial of FAPE. The IHO granted compensatory relief in the form of 250 hours of tutoring and/or art therapy. HOD, Admin. R. at 33.

Ms. Middleton brought the present action in January 2017. *See* Compl., ECF No. 1. She seeks review of the HOD and asks for compensatory relief for any denials of FAPE for which she has not already been compensated. Compl. at 35–36. Ms. Middleton also requests an order specifying that A.T. requires an IEP and corresponding placement and programming that includes (1) a minimum of 32 hours per week of specialized instruction outside of the general education setting; (2) placement on the certificate track and in small-group programming that focuses on functional/daily living skills and vocational training; and (3) a "results-oriented, realistic, and appropriate post-secondary transition" based on comprehensive assessments. Compl. at 36. The action is now before the Court on the parties' cross-motions for summary judgment. *See* ECF Nos. 10, 12.

## III. LEGAL STANDARD

In reviewing a challenge under the IDEA, courts conduct a two-part inquiry: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206–07 (1982) (footnotes omitted). "[A] school district's failure to comply with the procedural requirements of IDEA will be 'actionable' only 'if those procedural violations affected the student's substantive rights.'" *Leggett v. District of Columbia*, 793 F.3d

59, 67 (D.C. Cir. 2015) (quoting *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 832, 834 (D.C. Cir. 2006)).  Regulations clarify that "[i]n matters alleging a procedural violation, a hearing officer may find that a child did not receive a FAPE only if the procedural inadequacies (i) impeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of educational benefit."  34 C.F.R. § 300.513(a)(2).

With respect to a purported substantive violation of the IDEA, a court must determine whether the school district offered "an IEP reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty Sch. Dist. RE–1*, 137 S. Ct. 988, 999 (2017).  "The key inquiry regarding an IEP's substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to enable the specific student's progress." *Z.B. v. District of Columbia*, 888 F.3d 515, 524 (D.C. Cir. 2018).  "The 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials." *Endrew F.*, 137 S. Ct. at 992.  To that end, a suitable IEP "need not guarantee the best possible education or even a 'potential-maximizing' one." *Leggett*, 793 F.3d at 70 (quoting *Rowley*, 458 U.S. at 197 n.21).  Similarly, a mere "*de minimis* failure to implement all elements of [an] IEP" does not amount to a violation of the IDEA. *Wilson v. District of Columbia*, 770 F. Supp. 2d 270, 274 (D.D.C. 2011).  Rather, a party challenging a school district's implementation of an IEP must "demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP," *id.*, or that "deviations from the IEP's stated requirements

[were] 'material.'" *Catalan ex rel. E.C. v. District of Columbia*, 478 F. Supp. 2d 73, 75 (D.D.C. 2007).

A court reviewing the findings and decision of a hearing officer "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *see also* C.F.R. § 300.516(c). Although motions for review of an HOD are called motions for summary judgment, the court does not follow "a true summary judgment procedure." *L.R.L. ex rel. Lomax v. District of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993)). Instead, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the Court may receive." *D.R. ex rel. Robinson v. District of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009). "Where, as here, neither party submits additional evidence for the court's review, 'the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.'" *Q.C–C. v. District of Columbia*, 164 F. Supp. 3d 35, 44 (D.D.C. 2016) (quoting *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997)).

The party challenging the administrative determination "take[s] on the burden of persuading the court that the hearing officer was wrong." *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988). "While the court must make an independent determination, the court also should give 'due weight' to the decision of the hearing officer and should afford some deference to the expertise of the hearing officer and the school officials." *D.K. v. District of Columbia*, 983 F. Supp. 2d 138, 144 (D.D.C. 2013); *see also Rowley*, 458 U.S. at 206 ("[T]he provision that a

reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."). Furthermore, "[f]actual findings from the administrative proceeding are to be considered prima facie correct." *Roark ex rel. Roark v. District of Columbia*, 460 F. Supp. 2d 32, 38 (D.D.C. 2006) (alteration in original) (quoting *S.H. v. Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)). However, courts are to offer "less deference than is conventional in administrative proceedings." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005). And "a hearing decision without reasoned and specific findings deserves little deference." *Id.*

## IV. ANALYSIS

The parties each seek summary judgment on Ms. Middleton's claims that DCPS (1) failed to design an appropriate IEP for A.T. in April 2015; (2) improperly changed A.T.'s educational placement when he entered high school; (3) failed to fully implement A.T.'s April 2015 IEP; (4) failed to appropriately address A.T.'s attendance issues; (5) unreasonably and unlawfully conditioned the planned observation of Ms. Middleton's educational advocate; and (6) failed to provide A.T. an appropriate IEP in February 2016, all in violation of the IDEA. As explained below, the Court agrees in large part—but not entirely—with Ms. Middleton's contentions that DCPS failed in a host of ways to provide A.T. with a free appropriate public education. Accordingly, the Court grants her motion in part and grants DCPS's motion in part and remands this matter to the hearing officer for further proceedings.

### A. Appropriateness of A.T.'s April 2015 IEP

Ms. Middleton first challenges the appropriateness of A.T.'s April 2015 IEP, asserting that A.T. was denied a FAPE because the IEP (1) improperly placed him on the diploma track

and did so without consulting Ms. Middleton, (2) featured academic goals unsuitable for A.T., and (3) included a post-secondary transition plan that was not based on assessments of A.T.'s abilities and that contained unduly vague goals. The Court agrees with Ms. Middleton's first two contentions, but disagrees that A.T.'s post-secondary transition plan was so inadequate as to deny him a FAPE.

### 1. Diploma Track Placement

With regard to A.T.'s April 2015 IEP, Ms. Middleton protests the hearing officer's conclusion that DCPS did not deny A.T. a FAPE when it placed him on the standard high school diploma track rather than on track to receive a Certificate of IEP Completion and did so without consulting his parent. Mem. of Points & Auth. Supp. of Pl.'s Mot. Summ. J. ("Pl.'s Mem.") at 5–8, ECF No. 10-1. As explained below, the Court finds that the decision to put A.T. on diploma track constituted an educational placement. Furthermore, the Court concludes that the placement decision was defective for two distinct reasons—(1) because DCPS significantly impeded Ms. Middleton's opportunity to participate in the decisionmaking process, and (2) because A.T.'s placement on the diploma track was not reasonably calculated to enable him to make progress appropriate in light of his circumstances. Accordingly, the Court agrees with Ms. Middleton that the placement denied A.T. a FAPE.

### i. The Selection of a "Track" Constitutes an Educational Placement Under the IDEA

As a threshold matter, the Court must address the apparent dispute between Ms. Middleton on the one side and the hearing officer and DCPS on the other about whether the decision to put a student on diploma track constitutes an educational placement under the IDEA. *See* Pl.'s Mem. at 5 (arguing that "diploma track was part of the placement decision"); Mem. of Points & Auth. Supp. of Def.'s Opp'n to Pl.'s Mot. Summ. J. & Cross-Mot. Summ. J. ("Def.'s

Mem.") at 7–8 (suggesting that, under District of Columbia law, diploma track constitutes the default placement for all students), ECF No. 12-1. This question is a critical one because, based on the procedural safeguards of the IDEA, a school district must offer meaningful parental participation and prior written notice whenever it initiates or proposes to change a child's educational placement. *See* 20 U.S.C. § 1414; *see also* 34 C.F.R. §§ 300.116(a), 300.327, 300.501(b), 300.503(a). Thus, if the selection of a "track" constitutes an educational placement under the IDEA, DCPS was obligated to, among other things, notify Ms. Middleton of the proposed placement and permit her to participate as a member of the group ultimately deciding A.T.'s track and the failure to do so would be—at least—a procedural violation of the IDEA.

Both the hearing officer and DCPS intimate that a student's placement on diploma track constitutes something other than an educational placement. The hearing officer determined that the appropriateness of A.T.'s placement on the diploma track "c[a]me[] down to the fact that, pursuant to [District of Columbia regulations], the diploma track is default." HOD, Admin. R. at 23. Specifically, the hearing officer identified three reasons for his conclusion: (1) because a student "must be on diploma track unless specific action has been taken by his IEP team to shift him to the certificate track," (2) because some members of A.T.'s IEP team at Woodson believed that diploma track was appropriate for A.T. "despite his virtual inability to read and write due to his disabilities," and (3) because Ms. Middleton took no action to shift A.T. to certificate track after finding out his placement. HOD, Admin. R. at 23. In its briefing, DCPS echoes the hearing officer's assertions. *See* Def.'s Mem. at 7–9; Def.'s Reply to Pl.'s Opp'n to Def.'s Cross-Mot. Summ. J. ("Def.'s Reply") at 2–4, ECF No. 17. The Court disagrees.

Although the IDEA does not define "educational placement," courts in this jurisdiction and others have defined the term "as meaning something 'between the physical school attended

19

by the child and the abstract goals of a child's IEP.'" *D.K.*, 983 F. Supp. 2d at 145 (quoting *Laster v. District of Columbia*, 394 F. Supp. 2d 60, 64–65 (D.D.C. 2005)). As the Fourth Circuit put it, an "'educational placement' fixes the overall instructional setting in which the student receives his education, rather than the precise location of that setting." *AW ex rel. Wilson v. Fairfax Cty Sch. Bd.*, 372 F.3d 674, 683 (4th Cir. 2004). Thus, while the "basic elements[s] of the education program" constitute aspects of a student's educational placement, *see D.K. ex rel. Klein v. District of Columbia*, 962 F. Supp. 2d 227, 232 (D.D.C. 2013), lesser parts of a student's programming are not regarded as placement decisions. *See, e.g.*, *Lunceford v. District of Columbia Bd. of Educ.*, 745 F.2d 1577, 1582–83 (D.C. Cir. 1984) (concluding that a change in a student's feeding treatment at a residential program did not suffice to constitute a change in educational placement). Likewise, a change in the location of a student's services does not constitute a change in educational placement if there is no difference in the fundamental elements of the student's programming. *See, e.g.*, *Z.B. by and through Sanchez v. District of Columbia*, 292 F. Supp. 3d 300, 304–06 (D.D.C. 2018) (finding no change in educational placement where the services that the student would receive at a new school were "basically the same as those envisioned in his IEP and that he is currently receiving."); *D.K.*, 983 F. Supp. 2d at 145 (explaining that there is no change in educational placement "where a student is placed in a new program where all the basic elements are fundamentally the same as the prior placement").

The Court agrees with Ms. Middleton's suggestion that the decision whether to put a student on diploma or certificate track constitutes an educational placement under the IDEA because it undoubtedly shapes fundamental elements of the student's programming. First, District of Columbia law establishes different academic requirements for diploma track and certificate track. To earn a high school diploma, a student must satisfactorily complete twenty-

four Carnegie units in certain subjects,[3] including Algebra 1, World History, and Biology—courses in which A.T. was enrolled during his first year at Woodson. *See* D.C. Mun. Regs. tit. 5-A, § 2203.3; Testimony of Beth Sewell ("Sewell Tr."), Admin. R. at 2059, ECF No. 8-13. Though the teaching methods for a particular diploma-track course may be adjusted to permit a student with disabilities to access course material, the student's lessons are based on predefined grade-level curricular standards for the course. *See* Holman Tr., Admin. R. at 2109–10 (arguing that several diploma-track courses could not be appropriately modified to enable A.T. to access grade-level course material); Testimony of Wendy Wakefield ("Wakefield Tr."), Admin. R. at 1796–97, 1799–1800, ECF No. 8-10 (explaining what types of modifications are permitted for diploma-track courses). To pass each diploma-track course students, including those with disabilities, must demonstrate curriculum standard knowledge. *See id.* By contrast, a Certificate of IEP Completion may be awarded to a student with disabilities who has mastered his IEP goals and who has completed high school coursework, but who has not met the requirements for a standard high school diploma. *See id.* In certificate-track courses, when the nature of a student's disabilities do not enable him to make progress in the same curriculum as his nondisabled peers, a teacher can deviate from curricular standards to meet the student's unique needs. *See id.*

Second, the tracking decision shapes the courses selected for a student during his or her high school career.[4] *See* Testimony of Tarisai Lumumba-Umoja ("Lumumba-Umoja Tr."), Admin. R. at 1964 ("If the last page had identified certificate instead of diploma then his cross-

---

[3] A Carnegie unit is a unit of credit for course work. *See Douglass v. District of Columbia*, 750 F. Supp. 2d 54, 57 n.3 (D.D.C. 2010).

[4] The record does not reveal whether, as a matter of course, all diploma-track students are enrolled in diploma-track courses. However, school officials suggested that A.T.'s courses had been selected, at least in part, based on his placement on diploma track. *See, e.g.*, Lumumba-Umoja Tr., Admin. R. at 1964.

scheduling would have been different."), ECF No. 8-12.  For example, at present, a student on diploma track must successfully complete Algebra 1, Geometry, Algebra 2, and an additional Carnegie-unit eligible mathematics course to complete his assigned program.  By contrast, a student on certificate track must receive four mathematics unit credits—Carnegie or not—by completing "Concept of Mathematics" courses.  *See* D.C. Pub. Schs., *Is My Child on Track to Graduate?*, https://dcps.dc.gov/page/my-child-track-graduate (listing the requirements for a Certificate of IEP Completion).  Third, the diploma track requires a student to complete 100 hours of community service, while the certificate track includes no comparable requirement.  *See* 5-A D.C.M.R. § 2202.3; D.C. Pub. Schs., *Is My Child on Track to Graduate?*, https://dcps.dc.gov/page/my-child-track-graduate.  Because the track choice effectively determines major aspects of a student's high school programming—a fact that DCPS minimizes, but does not dispute—the Court agrees with Ms. Middleton that it constitutes part of the student's educational placement.

In suggesting otherwise, the hearing officer and DCPS rely on two provisions of District of Columbia law.  The first specifies that certain coursework "shall be required of students who enroll in ninth (9th) grade in school year 2007-2008 and thereafter in order to be certified as eligible to receive a high school diploma."  D.C. Mun. Regs. tit. 5-A, § 2203.1.  The second explains that "[a] student with special needs who does not achieve a diploma . . . shall be eligible to receive an Individual Educational Program (IEP) Certificate of Completion" and that "[t]he decision to pursue a program leading to an IEP Certificate of Completion shall be made by the IEP team including the parent(s) and where possible, the student."  *Id.* § 2203.8.  That provision goes on to provide that the decision to pursue certificate track "shall be made no earlier than the ninth (9th) grade and shall be attached in writing to the student's IEP."  *Id.*  DCPS and the

hearing officer contend that these provisions require diploma track placement for students with disabilities unless a parent raises and argues for certificate track placement. On this view, the diploma track may be selected as a default option for any and all students and, thus, it should be regarded as something other than an educational placement.

These contentions fail for four reasons. First and most critically, DCPS and the hearing officer seem not to recognize that a default determination of the educational programming for a child with disabilities is antithetical to the letter and spirit of the IDEA. The IDEA expressly requires school districts to offer instruction "*specially* designed to meet a child's *unique* needs through an '[*i*]*ndividualized* education program." *Endrew F.*, 137 S. Ct. at 999 (internal quotation marks omitted). Selection of programming by default does not, by any measure, fit the bill. District of Columbia regulations clarify that "[a]ll local education agencies (LEA) in the District of Columbia shall ensure, *pursuant to the Individuals with Disabilities Education Act (IDEA)*, that all children with disabilities . . . who are residents of the District of Columbia, have available to them a free appropriate public education (FAPE) and that the rights of these children and their parents are protected." D.C. Mun. Regs. tit. 5-E, § 3000; *see also id.* § 3801.1 ("The Board of Education's State Education Agency responsibilities shall include . . . [e]nsuring that all local education agencies in the District of Columbia are in compliance with the provisions of the Individuals with Disabilities Education Act (IDEA)."). Just as "the IDEA should be liberally applied and construed in favor of meeting its goals and providing appropriate and effective education to children with disabilities," this Court cannot adopt an interpretation of District of Columbia law that would so undermine the requirements of the IDEA. *See G ex rel. Ssgt RG v. Fort Bragg Dependent Schs.*, 324 F.3d 240 (4th Cir. 2003) ("[F]ederal law establishes a minimum 'baseline' of educational benefits that state must offer students with disabilities."); *see*

*also Wilderness Soc. v. Morton*, 479 F.2d 842, 881 (D.C. Cir. 1973) ("Courts should make every effort to reconcile allegedly conflicting statutes and to give effect to the language and intent of both, so long as doing so does not deprive one or the other of its essential meaning.").

Second, DCPS and the hearing officer seem to minimize the importance of the track decision, chalking it up to a topic that an IEP Team might reasonably gloss over on the way to weightier issues. *See* HOD, Admin. R. at 11 (noting that, at an October 2015 meeting, there was "no discussion about diploma versus certificate track"); Def.'s Mem. at 7–8. But it appears to this Court that few decisions are weightier than this one. The track decision shapes—if not dictates—other programming matters, including course selection, scheduling, and whether a child's teachers are permitted to deviate from predefined curricular standards. Neither DCPS nor the hearing officer reconciles the suggestion that an IEP Team might select the diploma track by default with the consequences facing a student based on the track selection.[5]

Third, the assertion that an IEP Team need only resolve the appropriateness of the track decision if a parent independently raises and challenges the diploma track placement is contrary to the requirements of the IDEA. The IDEA places affirmative obligations on each school district to design instruction to meet the child's unique needs. *See Endrew F.*, 137 S. Ct. at 999. This statutory duty does not vanish when a parent does not police the school district's compliance. As the D.C. Circuit recently underscored in *Z.B. v. District of Columbia*, 888 F.3d 515 (D.C. Cir. 2018), "merely reacting when parents complain is not enough" to satisfy the IDEA. *Id.* at 524 (addressing DCPS's obligation to identify students who qualify for services

---

[5] It bears mentioning that the IEP form requires the selection of a "Projected Exit Category"—high school diploma, high school certification prior to age 21, or high school certificate at age 21. And the form features no apparent thumb on the scale favoring selection of the diploma track.

under the IDEA); *see also James v. District of Columbia*, 194 F. Supp. 3d 131, 138 (D.D.C. 2016) ("School districts may not ignore disabled students' needs, nor may they await parental demands before providing special education services."). Resort to a purported default, based solely on a lack of parental dissent, surely does not satisfy DCPS's statutory duty to design instruction tailored to the child's unique needs.

Finally, it seems to this Court that the hearing officer and DCPS misapprehend the purpose of the District of Columbia regulations on which they rely. The relevant provisions are not, this Court believes, intended to lower the threshold of protections afforded to children with disabilities under the IDEA by permitting programming by default. Such a goal would be, at the very least, incompatible with other provisions of District of Columbia law that require that the District's local education agencies to act in compliance with the IDEA. *See* D.C. Mun. Regs. tit. 5-E, § 3801.1(b). Rather, it seems to this Court that the applicable provisions reflect the District of Columbia's commitment to ensuring that no students with disabilities who are capable of pursuing a high school diploma are deemed ineligible on the sole basis that they have disabilities. *See* D.C. Mun. Regs. tit. 5-A, § 2303 (listing eligibility requirements for a high school diploma and for an IEP Certificate of Completion). This mission is perfectly consistent with Congress's judgment that "the education of children with disabilities can be made more effective by having high expectations for such children" and with Congress's goal of "ensuring their access to the general education curriculum in the regular classroom, to the maximum extent possible, in order to meet development goals and, to the maximum extent possible, challenging expectations that have been established for all children." 20 U.S.C. § 1400(c)(5). But responsible pursuit of this mission does not require—or, indeed, permit—that the District mindlessly place students in programming that may be more rigorous than appropriate for a particular student's needs and

capabilities. The acceptance of contrary arguments would essentially shift special education in this jurisdiction back to the days when "children with disabilities 'were either totally excluded from schools or were sitting in regular classrooms awaiting the time when they were old enough to drop out.'" *D.L. v. District of Columbia*, 860 F.3d 713, 717 (D.C. Cir. 2017), an outcome untenable to Congress and to this Court.

In sum, the Court agrees with Ms. Middleton that the track decision constitutes an educational placement subject to the procedural protections of the IDEA and not, as DCPS asserts and the hearing officer assumed, a decision that may be made by default.

### ii. A.T.'s Placement on Diploma Track Denied Him a FAPE

Having determined that the track decision constitutes an educational placement, the Court next considers whether A.T.'s placement on the diploma track in his April 2015 IEP denied him a FAPE. Ms. Middleton argues that A.T.'s diploma track placement denied him a FAPE because (1) "DCPS checked the box 'diploma track' on his IEP at a meeting the parent had no knowledge of or involvement in," and (2) based on the evidence before A.T.'s IEP Team at Sousa— evidence that A.T. had significant cognitive deficits and had failed to make progress toward his IEP goals—it was entirely unreasonable to believe that A.T. could receive meaningful educational benefit on the diploma track. Pl.'s Mem. at 5–8. DCPS disagrees, arguing that several Woodson teachers and school officials believed that A.T. was capable of earning a high school diploma. Def.'s Mem at 8. Notably, the hearing officer found no denial of a FAPE based on A.T.'s diploma track placement, but declined to determine which track better suited A.T. and ordered Woodson school officials to meet with Ms. Middleton to discuss the placement decision. *See* HOD, Admin. R. at 23–24. The Court agrees with both of Ms. Middleton's arguments—DCPS denied A.T. a FAPE by significantly impeding Ms. Middleton's opportunity to participate in the decisionmaking process regarding the provision of a FAPE to her child and

also by selecting an educational placement that was not reasonably calculated to enable him to make progress appropriate in light of his circumstances.

First, the Court finds that, contrary to the hearing officer's conclusion—which, as explained above, was based on a misunderstanding about the nature of the placement decision—DCPS violated the procedural requirements of the IDEA by failing to afford Ms. Middleton an opportunity to participate in the process of determining A.T.'s track placement. The IDEA requires that school districts offer "[a]n opportunity for the parents of a child with a disability . . . to participate in meetings with respect to the . . . educational placement of the child." 20 U.S.C. 1415(b)(1). The statute further mandates that "whenever the local educational agency . . . proposes to initiate or change . . . the educational placement of the child," a parent must be sent prior written notice, which must feature, among other things, a description of the proposed action, a description of other options considered by the IEP Team, and some explanation of why the other options were rejected. *Id.* § 1415(b)(3), (c)(1). The intent of prior written notice is to "provide sufficient information to protect the parents' rights under the Act" and to "enable the parents to make an informed decision whether to challenge the DCPS's determination and to prepare for meaningful participation in the due process hearing on their challenge." *Jalloh v. District of Columbia*, 968 F. Supp. 203, 213 (D.D.C. 2013) (quoting *Kroot v. District of Columbia*, 800 F. Supp. 976, 982 (D.D.C. 1992)). Because, as explained above, the track decision constituted an educational placement, DCPS was required to comply with the procedural safeguards related to the making of such a decision.

The record offers no indication that Ms. Middleton received prior written notice of the placement decision or any opportunity to meaningfully participate in the placement decision. Indeed, DCPS does not contest Ms. Middleton's contention that she had no opportunity to

participate in—and had no prior knowledge of—the April 2015 IEP meeting during which A.T.'s IEP Team placed him on diploma track and no knowledge of A.T.'s diploma track placement until months after the decision had been made. *See* Pl.'s Mem. at 5; *see also* Def.'s Mem. at 7–9. DCPS appears to argue that its IDEA obligations were, in any event, met because (1) Ms. Middleton was belatedly notified of A.T.'s diploma track placement during an October 2015 IEP meeting and she failed to raise any objection to the placement at that time, and (2) other members of A.T.'s IEP Team believed that the diploma track placement was appropriate for A.T. *See* Def.'s Mem. at 8–9. Neither rationale suffices to satisfy DCPS's procedural obligations under the IDEA.

The Court need not spill much ink rejecting DCPS's first argument. DCPS's obligations to provide prior written notice of a proposed educational placement and an opportunity for a parent to participate in the educational placement decision surely are not met by a vague, post-decisional mention that some placement decision has been made. There is no indication that during the October 2015 IEP meeting, DCPS disclosed any of the information required by 20 U.S.C. § 1415(c)(1), let alone that during that meeting Ms. Middleton was afforded an opportunity to participate in the decisionmaking process. *Compare Jalloh ex rel. R.H. v. District of Columbia*, 535 F. Supp. 2d 13, 24 (D.D.C. 2008) (concluding that a placement decision was appropriate even though the required information was not set forth in prior written notice because all of the required information was elicited at an IEP meeting that was attended by the parent). And the record does not show that at any time prior to Ms. Middleton's filing of a due process complaint, DCPS ever provided any basis for its placement decision, any explanation of the differences between diploma track and certificate track, any notion of why diploma track might meet A.T.'s individual needs, or any notice to Ms. Middleton of her right to participate in

the decisionmaking process. *See* 34 C.F.R. § 300.503(a) (describing the notice requirement). Indeed, DCPS thwarted Ms. Middleton's attempts at securing information about A.T.'s placement and the courses in which he was enrolled when it repeatedly failed to respond to pointed emails from Ms. Middleton's representatives.

The onus is on DCPS to reveal information relevant to a proposed placement. A parent need not raise and object to an already-made placement decision to secure an opportunity to participate in the decisionmaking process. *See* 20 U.S.C. § 1415(b)(3); *cf. Z.B.*, 888 F.3d at 524 ("[M]erely reacting when parents complain is not enough."); *M.C. ex rel. J.C. v. Cent. Regional Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996) ("[A] child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor be abridged because the district's behavior did not rise to the level of slothfulness or bad faith.") The Court rejects DCPS's argument that any vague, cursory, and belated notice offered to Ms. Middleton satisfied the applicable procedural requirements.

As for DCPS's second argument, the Court finds unavailing the contention that other members of A.T.'s IEP Team believed that A.T. was adequately suited for the diploma track. While the IDEA does not require that a parent ultimately agree with a placement decision, the Act does guarantee the parents of children with disabilities an opportunity to participate in the placement process. *See* 20 U.S.C. § 1414(b); *cf., e.g.*, *Paolella ex rel. Paolella v. District of Columbia*, 210 F. App'x 1, 1 (D.C. Cir. 2006) (concluding that parents had a meaningful opportunity to participate in the placement process, though the parents ultimately disagreed with the placement decision); *Holdzclaw v. District of Columbia*, 524 F. Supp. 2d 43, 47 (D.D.C.

2007). The views of other members of the IEP Team certainly do not satisfy the above-outlined procedural requirements.[6]

The failure to include Ms. Middleton in the placement decision is a procedural violation of the IDEA. But, as the Court explained above, procedural violations do not inescapably lead a court to conclude that a school district denied a child a FAPE. Rather, "an IDEA claim is viable only if those procedural violations affected the student's substantive rights." *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006). And substantive harm occurs only if the preponderance of the evidence establishes that the procedural inadequacies "(i) [i]mpeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decisionmaking process regarding the provision of a FAPE to the parent's child; or (iii) caused the deprivation of the educational benefit." 34 C.F.R. § 300.513.

Here, the procedural inadequacies, at the very least, significantly impeded Ms. Middleton's opportunity to participate in the decisionmaking process regarding the provision of a FAPE to A.T., thereby denying him a FAPE. Sousa school officials placed A.T. on the diploma track without notifying Ms. Middleton or her educational advocate, without seeking Ms. Middleton's input on the placement decision, and, apparently, without explaining how that decision would affect A.T.'s high school programming and experience. Then, Woodson school

---

[6] The record shows that some Woodson teachers had the impression that Ms. Middleton wanted A.T. placed on the diploma track. *See* Sewell Tr., Admin. R. at 2056–57 (suggesting that there appeared to be a disagreement between Ms. Middleton and Dr. Holman regarding the appropriate track placement). However, the record is ambiguous at best as to why the teachers had such an impression. *See* Testimony of Renee Middleton ("Middleton Tr."), Admin. R. at 2079 (asserting that she did not suggest to Woodson school officials and teachers that she wanted A.T. on diploma track), ECF No. 8-13. And, in any event, assuming that Ms. Middleton had referenced a vague desire that her son complete a high school diploma during an informal conversation or two, this alone would not suffice to meet the DCPS's procedural obligations under the IDEA.

officials neglected to answer even basic questions about A.T.'s placement until weeks after he had begun high school. And the record reveals that even the belated communications about A.T.'s track placement were perfunctory at best. The preponderance of the evidence shows that DCPS's decision to place A.T. on the diploma track without affording his mother an opportunity to participate in the decisionmaking process denied him a FAPE.

In any event, putting procedural inadequacies to the side, the April 2015 diploma track placement decision denied A.T. a FAPE for another reason: it was not reasonably calculated to enable A.T. to receive educational benefit. In *Endrew F.*, the Supreme Court explained that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 137 S. Ct. at 999. In evaluating an IEP, a court must determine "whether, taking account of what the school knew or reasonably should have known of the student's needs at the time, the IEP it offered was reasonably calculated to enable the specific student's progress." *Z.B.*, 888 F.3d at 524. Notably, "that standard calls for evaluating an IEP as of 'the time each IEP was created' rather than with the benefit of hindsight," *id.* (quoting *Endrew F.*, 202 F. Supp. 3d at 75–76), though "evidence that 'post-dates' the creation of the IEP is relevant to the inquiry to whatever extent it sheds light 'on whether the IEP was objectively reasonable at the time it was promulgated.'" *Id.* (quoting *Endrew F.*, 202 F. Supp. 3d at 76 n.23)).

As the Court noted above, the record in this case features no evidence regarding what was discussed at the April 2015 IEP meeting during which A.T. was placed on the diploma track. Neither Ms. Middleton nor her educational advocate attended it—or, at the time it took place, even knew that it had occurred. No witness who testified at the due process hearing in this matter had attended it either. The hearing officer heard no testimony from any Sousa school

teacher or official involved in making any decision about A.T.'s high school placement. And DCPS itself seems to contend that Woodson school officials had no occasion to reconsider the diploma track placement made at Sousa because Ms. Middleton expressed no explicit discontentment with it. Thus, the Court looks primarily to the face of the IEP to determine its appropriateness.

For two reasons, the Court concludes that the diploma track placement was not reasonably calculated to enable A.T. to make progress appropriate in light of his circumstances. First, as Ms. Middleton notes, A.T.'s April 2015 IEP described his several limitations, and the Court strains to imagine how, given those limitations, A.T. could possibly be expected to progress in the standard high school curriculum that is apparently used to evaluate special education students who are on the diploma track. *See* Wakefield Tr., Admin. R. at 1796–97, 1799–1800 (explaining the standards applied in diploma-track, special education courses). According to A.T.'s IEP, in mathematics, he scored in the "very low range" on several assessments. 4/24/2015 IEP, Admin. R. at 345. While he could add multi-digit whole numbers and could subtract single digit whole numbers, he could not multiply multi-digit whole numbers or divide even single digit numbers. 4/24/2015 IEP, Admin. R. at 345. He was unable to compute with fractions. 4/24/2015 IEP, Admin. R. at 345. In reading, A.T. had received scores in the "very low range." 4/24/2015 IEP, Admin. R. at 347. He was found able to understand pictures, but unable to comprehend even simple sentences and paragraphs. 4/24/2015 IEP, Admin. R. at 347. In writing, A.T. could write his name, but not his birth date, address, or relatives' name. 4/24/2015 IEP, Admin. R. at 348. He had received a score of 0 on a writing fluency test; on a spelling assessment, he was able to write upper and lowercase letters but was unable to spell any words. 4/24/2015 IEP, Admin. R. at 349. His scores on cognitive

assessments had revealed low cognitive functioning. 4/25/2015 IEP, Admin. R. at 349. A.T.'s sole area of notable strength: his nearly age-appropriate (to wit, "good") conversation and nonverbal communications skills, 4/24/2015 IEP, Admin. R. at 350—capabilities that this Court speculates might have masked his many weaknesses to those unfamiliar with the nature of his disabilities.

Second, the face of the April 2015 IEP appears to note that A.T. could not access the grade-level general education curriculum in mathematics, reading, and writing. The IEP states no fewer than three times that A.T.'s deficits "*prevent* him from being able to access the general education curriculum at the 7th grade level"—notably, not even A.T.'s then- or future grade-level—in reading, writing, and mathematics. Instead, it explains that A.T. "require[d] constant assistance, significant modifications and differentiation to access *curriculum that is significantly below grade level.*" 4/24/2015 IEP, at Admin. R. 345, 347, 349. These conclusions undermine the District's position that the diploma-track placement—a placement that would require A.T. to meet predefined grade-level curricular standards—was reasonably calculated to enable him to receive educational benefits.

DCPS tells this Court, as it told the hearing officer, that despite A.T.'s limitations— including his virtual inability to read and write due to his disabilities—A.T. was capable of earning a high school diploma. *See* Def.'s Mem. at 8. DCPS relies on the testimony of Woodson's special education coordinator, who testified that she believed that A.T. was capable of getting a high school diploma if he applied himself. Def.'s Mem. at 8. DCPS also cites the testimony of Woodson's school psychologist, who remarked that staying on diploma track would help A.T.'s self-esteem and apparent anxiety, and would make him feel "successful." Def.'s Mem. at 8–9. Finally, DCPS mentions the testimony of A.T.'s Algebra 1 teacher at Woodson,

who remarked that she believed that A.T. could earn Carnegie units toward a high school diploma.  Def.'s Mem. at 9.

None of this testimony—which consists of retrospective evidence of A.T.'s purported progress on the diploma track while at Woodson—sheds light on whether A.T.'s placement was designed to serve his needs at the time the placement was made.  These witnesses developed their respective impressions of A.T.'s capabilities based on experiences with A.T. after he had started at Woodson, evidence unavailable to any decisionmaker who put him on the diploma track.  More importantly, though, the testimony of these Woodson school officials and teachers appears to this Court to be largely unmoored from any tangible performance metric or any evidence of A.T.'s needs.  For example, DCPS makes much of A.T.'s Algebra 1 teacher's testimony.  But, in fact, her testimony regarding whether A.T. was capable of earning Carnegie units toward a diploma was limited to math courses only, and she added a caveat that A.T.'s "teacher[s] would have to, you know, be able to work with him and meet him where he's at." Wakefield Tr., Admin. R. at 1772.  Furthermore, the teacher revealed that she had not been privy to information about the nature and extend of A.T.'s low cognitive functioning and his difficulties with memory retention.  *See* Wakefield Tr., Admin. R. at 1780–81.  Likewise, testimony that a diploma track placement would make A.T. feel "successful" and bolster his self-esteem is evidence far too thin to support such a crucial decision, especially in view of the statements on his IEP that suggest that he could not progress on such a path.

In sum, the Court agrees with Ms. Middleton that the preponderance of the evidence available at the time that A.T. was placed on the diploma track shows that the placement was not reasonably calculated to enable him to make progress appropriate in light of his circumstances. Accordingly, the Court concludes that the placement decision denied A.T. a FAPE.

## 2. Annual Goals

Next, Ms. Middleton argues that the annual goals listed on A.T.'s April 2015 IEP were inadequate and inappropriate because they were linked to seventh grade common core standards—notably, not even A.T.'s grade-level—and they were not based on his individual needs. *See* Pl.'s Mem. at 8–10. DCPS maintains that the use of common core standards was appropriate. *See* Def.'s Mem. at 10–13. The hearing officer found no violation of the IDEA, observing that "[a]s long as [A.T.] is on the diploma track the appropriate reference point for his goals are the common core standards as modified and tailored to take into account [A.T.'s] abilities."[7] HOD, Admin. R. at 24. Having already concluded that the placement decision was inappropriate, this Court also agrees with Ms. Middleton that the associated goals were inappropriate for A.T.'s level of skill and ability and his needs and that the decision to utilize them was not reasonably calculated to enable him to make progress appropriate in light of his circumstances.

An IEP must include "a statement of measurable annual goals, including academic and functional goals." 20 U.S.C. § 1414(d)(1)(A). The goals are "designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum" and to "meet each of the child's other educational needs that result from the child's disability." *Id.* Like other aspects of an IEP, annual goals are suitable if they are "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. An "IEP need not aim for grade-level

---

[7] The Court owes no deference to the hearing officer's contrary conclusion about the adequacy of A.T.'s IEP goals. The hearing officer based his conclusion on a mistaken belief that A.T.'s diploma track placement was appropriate, reasoning that goals stemming from the diploma track placement must also be appropriate. But, as the Court explained in detail above, the hearing officer reached an incorrect conclusion on the diploma-track placement issue.

advancement," if inappropriate given the specific needs of the child, but a child's "educational program must be appropriately ambitious in light of his circumstances." *Id.* at 1001. In reviewing the substantive adequacy of IEP goals, a court "must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 999. And a court may not "substitute [its] own notions of sound educational policy for those of the school authorities which they review." *Id.* at 1001 (quoting *Rowley*, 458 U.S. at 206); *see also Dixon v. District of Columbia*, 83 F. Supp. 3d 223, 233 (D.D.C. 2015) ("The sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." (alteration omitted) (quoting *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003))). However, having respect for the expertise of school officials does not require a court to endorse conclusions about the adequacy of a student's goals that are not supported by the record.

Ms. Middleton contends that A.T.'s mathematics, reading, and writing goals do not satisfy the standards set forth in the IDEA. Specifically, Ms. Middleton argues that A.T.'s mathematics goals—(1) to determine the difference between sales tax and discounts in order to solve word problems that were read to him and (2) to analyze a set of data to find the mean, median, and mode and to create a graphic representation of the data—were "well above his understanding [and were] not reasonably calculated to address [his] need for significant remediation in mathematics in addition to learning functional mathematics like counting money and telling time." Pl.'s Mem. at 8. A.T.'s reading goals were to identify the chronological sequence of plot in a story read aloud to him and, with text read aloud to him and with significant prompting, to identify the key details of an informational text as they relate to the main idea. Ms. Middleton complains that "[i]nstead of having goals based on the student's need to learn

sight words, decoding and blending, the IEP focuse[d] on concepts that are abstract, and not necessary or appropriate for a non-reader." Pl.'s Mem. at 9. Finally, A.T.'s writing goal was to "respond to a text dependent question in written format and employ the requirements for writing a sentence by using correct spelling, punctuation, grammar, and mechanics." 4/24/2015 IEP, Admin. R. at 349. According to Ms. Middleton, this goal was inappropriate because A.T. could not read at all at the time that the IEP was created. Pl.'s Mem. at 9.

DCPS defends the goals featured on A.T.'s IEP, contending that, though lofty, A.T.'s goals were reasonably calculated to enable him to make progress appropriate in light of his circumstances. *See* Def.'s Mem. at 10–13. In justifying A.T.'s mathematics goals, DCPS cites testimony from A.T.'s Algebra 1 teacher regarding modifications and accommodations that she used to teach him. Def.'s Mem. at 10. With regard to A.T.'s reading and writing goals, DCPS asserts—without any elaboration—that "[c]learly, the IEP team considered A.T.'s reading deficits when writing his reading goals" and that "[a]gain, the IEP team recognized A.T.'s writing deficits and the lone goal addresses those deficits." Def.'s Mem. at 11. The Court agrees with Ms. Middleton that A.T.'s IEP goals were not reasonably calculated to enable him to make progress appropriate in light of his circumstances.

The record lays bare A.T.'s significant deficits in mathematics, reading, and writing. As recounted in detail above, A.T. could not read, could barely write, and could perform only basic mathematics. And yet, DCPS failed to in any way remediate these issues. For example, instead of placing A.T. in a reading program and setting goals related to those deficits, A.T. was expected to work toward "identify[ing] the chronological sequence of a plot in a literary story." 4/24/2015 IEP, Admin. R. at 347. Instead of learning to write his birth date or his address or to write a full sentence—deficits specifically identified in his IEP—A.T. was expected to work

toward "respond[ing] to a text dependent question in written format" while "employ[ing] the requirements for writing a sentence by using correct spelling, punctuation, grammar and mechanics." 4/24/2015 IEP, Admin. R. at 349. And, instead of learning to divide single digits or compute fractions, A.T. was expected to work toward "determin[ing] the difference between sales tax and discounts in order to solve word problems." 4/24/2015 IEP, Admin. R. at 346. The Court need not—and does not—substitute its own judgment about educational policy to identify the several inadequacies in A.T.'s goals. DCPS's bald assertions to the contrary are wholly unpersuasive.

The IDEA requires that school districts ensure that students with disabilities have the chance to meet challenging objectives. *Endrew F.*, 137 S. Ct. at 1000. But, here, DCPS mistakes goals ill-suited for a student's needs and circumstances and unmoored from evidence regarding the student's past performance for "lofty" goals. The Court agrees with Ms. Middleton that DCPS failed to design appropriate goals given A.T.'s needs and circumstances, thereby violating the IDEA and denying him a FAPE.

### 3. Post-Secondary Transition Plan

Ms. Middleton next argues that DCPS violated the IDEA by failing to include an appropriate transition plan for A.T. in his April 2015 IEP. Specifically, Ms. Middleton asserts that DCPS neglected to conduct assessments necessary to determine A.T.'s skills, abilities, and weaknesses, and relied only on assessments of his interests to create the transition plan. Pl.'s Mem. at 10–11, 13–14; Pl.'s Reply to Def.'s Opp'n to Pl.'s Cross-Mot. Summ. J. ("Pl.'s Reply") at 15–16, ECF No. 15. The result, Ms. Middleton claims, is that A.T.'s transition plan included goals unrealistic for his abilities. Ms. Middleton also contends that the transition plan contained unduly vague goals. *See* Pl.'s Mem. at 10–11, 13–14; Pl.'s Reply at 15–16. The Court

concludes that the preponderance of evidence on record shows that the transition plan was age appropriate and that the goals featured in the plan were not vague.  Accordingly, the Court finds no violation of the IDEA with regard to DCPS's design of A.T.'s April 2015 IEP transition plan.

The IDEA mandates that every IEP, beginning no later than the first IEP in effect when a child is sixteen years old, must include "appropriate measurable postsecondary goals based on age appropriate transition assessments related to training, education, employment, and where appropriate, independent living skills."  20 U.S.C. § 1414(d)(1)(A)(i)(VIII).  Transition services must also be "based on the individual child's needs, taking into account the child's strengths, preferences, and interests."  *Id.* § 1401(34)(B).  The record shows that the District administered two assessments (the "Student Dream Sheet" and "Career Clueless Career Inventory") on which it based A.T.'s April 2015 transition plan.  *See* Admin. R. at 359, 1868–70; Def.'s Mem. at 14; Pl's Mem. at 10; Pl.'s Reply at 11–12.  According to the testimony of Christopher Nace, a Program Manager of Secondary Transition for DCPS, the "Career Clueless Career Inventory" is a "middle school specific assessment that's used nationwide as a middle school assessment," and the "Student Dream Sheet" is "essentially an interview sheet" that is "use[d] for middle school just because it's a great starting point" and "has age appropriate questions."  Testimony of Christopher Nace ("Nace Tr."), Admin. R. at 1868, ECF No. 8-11.  Mr. Nace testified that, as a matter of course, the District emphasizes career exploration for middle school students, and does not generally focus on whether a student's interests align with the student's capabilities.  Nace Tr., Admin. R. at 1873.  The middle school years, Mr. Nace explained, are often the first moments during which students are exposed to career exploration, and DCPS has "a number of years to make sure that we're exploring and finding a career that the student is both interested in and meets their abilities and limitations."  Nace Tr., Admin. R. at 1873.  According to Mr. Nace,

this period of exploration is particularly important for students with disabilities who "tend to be placed into careers that are not in their interest" and who instead "are placed in careers based on what other people think they are capable of doing." Nace Tr., Admin. R. at 1876. Primarily based on this testimony, which the hearing officer deemed "highly credible," the IHO concluded that A.T.'s post-secondary transition plan was based on age-appropriate assessments. HOD, Admin. R. at 24.

Mr. Nace opined that the assessments conducted to develop A.T.'s transition plan were appropriate for middle school students. It seems that this conclusion applied equally to a student like A.T who was evaluated in eighth grade in order to craft a plan to be implemented during his ninth-grade year. *See* Nace Tr., Admin. R. at 1887–88. Ms. Middleton obviously disagrees with the expert testimony—and the hearing officer's conclusion—that "age appropriate transition assessment[s]" for a middle school student moving on to high school need not include skills assessments designed to show a child his capabilities, strengths, and weaknesses. *See* HOD, Admin. R. at 24. This does not, however, suffice as a basis for disrupting the hearing officer's reasoned decision. The hearing officer's conclusions that the assessments were age appropriate and that they supplied sufficient bases upon which to design A.T.'s transition plan are fully and fairly supported by the record. The District was not required to conduct assessments of the sort that Ms. Middleton preferred to meet its obligations under the IDEA.

As for Ms. Middleton's argument that A.T.'s transition plan was "lacking in substance, clarity, or specificity," Pl.'s Mem. at 10, the Court finds that Ms. Middleton has failed to identify any procedural or substantive inadequacy in the plan. As Mr. Nace testified, A.T.'s transition plan included broad, long-term post-secondary education and employment goals—specifically, to "attend a job training program for a job of his choice" and "to be employed" upon graduation

from high school.  *See* IEP 4/24/2015, Admin. R. at 359–60.  But the plan also included specific short-term goals.  For example, to prepare A.T. for post-secondary education and training, the IEP stated that, within the year, A.T. would use the internet to identify four different locations in the D.C. Metropolitan Area that offer information on job training programs.  He was to map out how and when he would visit each location and was to present a plan to his case manager.  IEP 4/24/2015, Admin. R. at 360.  And to prepare A.T. for post-secondary employment, the plan specified that he would identify four traits consistent with individuals who are employed in a 9–5 career, and he would document the knowledge, skills, and abilities necessary to have a successful career in a 9–5 position.  IEP 4/24/2015, Admin. R. at 360.  Afterward, he would present his findings to his case manager.  Ms. Middleton provides no basis on which the Court could disrupt the hearing officer's conclusion that DCPS devised "measurable postsecondary goals," as the IDEA requires.  In sum, Ms. Middleton has not shown that A.T.'s postsecondary goals and transitions services were inappropriate or that DCPS did not comply with the IDEA in crafting the plan.

***

With respect to A.T.'s April 2015 IEP, the Court concludes that DCPS violated the IDEA and denied A.T. a FAPE when it placed A.T. on the diploma track and when it designed IEP goals that were based on grade-level curriculum standards and not on A.T.'s needs and capabilities.  However, the evidence on record shows that A.T.'s April 2015 transition plan satisfied the requirements of the IDEA.

## B.  Change in Placement

Before the hearing officer, Ms. Middleton argued that DCPS had inappropriately changed A.T.'s placement from a self-contained program at Sousa to a much larger environment at

Woodson where he was expected to handle transitions and lunch on his own. *See* Pl.'s Mem. at 16–22. The hearing officer agreed, concluding that A.T.'s placement had changed based on his shift from a self-contained program, where the entire class moved together throughout the day, to a setting where he "had to find his way in a much larger environment and was expected to handle transitions and lunch on his own." HOD, Admin. R. at 26. The hearing officer determined that DCPS had denied A.T. a FAPE by excluding Ms. Middleton from the placement determination. HOD, Admin. R. at 26–27. However, the hearing officer explained that, while A.T. faced "serious challenges . . . in coming into a much bigger school with much less support," "on balance" A.T.'s placement in the Specific Learning Support ("SLS") program at Woodson was reasonably calculated to enable A.T. to receive educational benefit and, thus, was appropriate. HOD, Admin. R. at 26–27. Specifically, the hearing officer observed that A.T.'s IEP was implemented in small special education classes and that in the new placement A.T. was "able to experience more independence, make more decisions for himself, and have more autonomy." HOD, Admin. R. at 27. Ms. Middleton challenges the determination that A.T.'s placement was appropriate. *See* Pl.'s Mem. at 16–20; Pl.'s Reply at 27–31. The Court finds that the preponderance of the evidence supports Ms. Middleton's contentions. A.T.'s change in placement was not reasonably calculated to enable him to receive educational benefit.

The IDEA requires school districts to offer placement in a school and in programming that can fulfill the requirements set forth in the student's IEP. *O.O. ex rel. Pabo v. District of Columbia*, 573 F. Supp. 2d 41, 53 (D.D.C. 2008). A state satisfies this requirement if a placement can provide "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley*, 458 U.S. at 203. "[C]ourts have identified a set of considerations 'relevant' to determining whether a particular placement is

appropriate for a particular student, including the nature and severity of the student's disability, the student's specialized educational needs, the link between those needs and the services offered by the school, . . . and the extent to which the placement represents the least restrictive educational environment." *Branham ex rel. Branham v. Gov't of the D.C.*, 427 F.3d 7, 13 (D.C. Cir. 2005). A school district need only demonstrate that the student's placement was appropriate; a placement need not satisfy a parent's every desire and need not represent the best possible programming for the student. *See Kerkam v. McKenzie*, 862 F.2d 884, 886 (D.C. Cir. 1988) ("[P]roof that loving parents can craft a better program than a state offers does not, alone, entitle them to prevail under the Act."); *Holland v. District of Columbia*, 71 F.3d 417, 419 (D.C. Cir. 1995) (The IDEA "does not necessarily guarantee the child [with a disability] the best available education.").

The Court agrees that the record supports Ms. Middleton's contention that A.T.'s problem began with—and stemmed at least in part form—his change in placement from a small, self-contained class at Sousa to a larger environment where he would have to independently navigate transitions. First, DCPS apparently placed A.T. in the SLS program at Woodson based on his placement on the diploma track—a decision that the Court already explained was not reasonably calculated to confer educational benefit. Lumumba-Umoja Tr., Admin. R. at 1966 ("[T]he SLS program is for students . . . who are on a diploma track or have a high level of need on their IEP."), 2015 (identifying programming for certificate track students). Second, A.T.'s attendance record, which revealed 57 absences for the year, buttresses Ms. Middleton's claim. Indeed, a functional behavior assessment conducted toward the end of A.T.'s ninth-grade year noted that A.T. was "more likely to engage in the off-take/resistant behaviors when he d[id] not understand an assignment, when he d[id] not have a relationship with the staff or if there [were]

too many students in the class."  Admin. R. at 536.  Third, though DCPS asserts that A.T. eventually adapted to Woodson, the record contains only scant evidence supporting this assertion.  True enough, some of A.T.'s teachers and other school officials believed that A.T. had adapted to the school environment.  But that conclusion seems to fly in the face of evidence that A.T. constantly missed classes, roamed the hallways, avoided the lunchroom, and, on many occasions disengaged in the classroom.  The Court need not—and likely could not—disentangle which of the lapses in A.T.'s educational programming resulted from the diploma track placement and which resulted from his placement in the SLS program at Woodson.  It suffices to conclude that A.T.'s placement in the SLS program at Woodson—a decision apparently made "downtown" rather than by A.T.'s IEP Team—was not reasonable calculated to enable him to progress appropriate in light of his circumstances.

### C.  Implementation of the April 2015 IEP

Ms. Middleton next challenges the implementation of A.T.'s April 2015 IEP.  Namely, she argues that DCPS denied A.T. a FAPE by failing to provide all of his classes outside of the general education setting in conformity with his IEP.  *See* Pl.'s Mem. at 22–27; Pl.'s Reply at 19–26.  On this issue, the hearing officer agreed that DCPS had varied from A.T.'s written IEP in certain respects.  However, the hearing officer found these variances to be *de minimis*.  HOD, Admin. R. at 28–29.  The Court disagrees with the hearing officer's assessment and finds that DCPS denied A.T. a FAPE by failing to properly implement this aspect of his IEP.

A school district "must ensure that . . . special education and related services are made available to the child in accordance with the child's IEP."  34 C.F.R. § 300.323(c)(2).  A material failure to implement a student's IEP constitutes a denial of a FAPE.  *Johnson v. District of Columbia*, 962 F. Supp. 2d 263, 268–69 (D.D.C. 2013).  To meet its burden, the moving party

"must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP." *Beckwith v. District of Columbia*, 208 F. Supp. 3d 34, 49 (D.D.C. 2016) (quoting *Hous. Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000)). "Generally, in analyzing whether a student was deprived of an educational benefit, 'courts . . . have focused on the proportion of services mandated to those actually provided, and the goal and import (as articulated in the IEP) of the specific service that was withheld.'" *Id.* (quoting *Wilson v. District of Columbia*, 770 F. Supp. 2d 270, 275 (D.D.C. 2011)).

A.T.'s April 2015 IEP called for 27 hours of specialized instruction per week. 4/24/2015 IEP, Admin. R. at 353. The parties apparently agree that this IEP called for A.T. to have all of his classes outside of the general education setting. *See* HOD, Admin. R. at 28; Pl.'s Mem. at 23; Def.'s Mem. at 23. Notwithstanding this requirement, A.T. was enrolled in three general education or inclusion classes—World History (a twenty-five student inclusion class), Music (a general education class), and Physical Education (a general education class). *See* HOD, Admin. R. at 28. The hearing officer found that Woodson sufficiently satisfied the IEP with respect to A.T.'s World History course because he was periodically separated into a smaller group for specialized instruction. HOD, Admin. R. at 28. However, the hearing officer deemed A.T.'s Physical Education course setting "clearly improper," and his Music course setting "likely improper," despite some testimony that a paraprofessional worked with A.T. and a small group of students in that class. HOD, Admin. R. at 28–29. As the vast majority of A.T.'s courses were in the special education setting, as required by the IEP, the hearing officer found no IDEA violation. *See* HOD, Admin. R. at 29.

The Court disagrees with the hearing officer's conclusion. Courts in this jurisdiction have deemed deviations from an IEP immaterial where the student received only slightly fewer

hours of instructional time than called for in an IEP. *See, e.g.*, *Johnson v. District of Columbia*, 962 F. Supp. 2d 263, 269 (D.D.C. 2013) (three hour discrepancy between the instructional hours called for in the student's IEP and the hours actually received did not constitute a material failure to implement the IEP); *Savoy ex rel. T.W. v. District of Columbia*, 844 F. Supp. 2d 23, 33–35 (D.D.C. 2012) (discrepancy of less than an hour per week did not constitute a material failure to implement); *Catalan v. District of Columbia*, 478 F. Supp. 2d 73, 75–76 (D.D.C. 2007) (where student's IEP called for forty-five minutes of speech therapy per week, the facts that several sessions were missed because of the therapist's unavailability and that some sessions were cut short because of student's fatigue did not constitute material deviations from the IEP). Here, as Ms. Middleton argues, either 40% (if World History is included) or 20% (if World History is excluded) of A.T.'s instruction was not performed in conformity with A.T.'s IEP. *See* Pl.'s Mem. at 23–24, 26. The Court disagrees that such a deviation is *de minimis*. Indeed, the Court cannot help but speculate that the fact that A.T. was enrolled in general education courses, despite clear direction in his IEP requiring otherwise, likely compounded A.T.'s other difficulties during the 2015–16 school year. The Court finds that the failures to implement A.T.'s IEP were material, thus violating the IDEA and denying A.T. a FAPE.

### D. Attendance Issues

Ms. Middleton next contends that the school district violated the IDEA by failing to offer sufficient interventions to address A.T.'s disability-related class attendance issues throughout the 2015–16 school year. *See* Pl.'s Mem. at 27–31. DCPS does not contest Ms. Middleton's assertion that it had some obligation to address A.T.'s attendance issues. *See* Def.'s Mem. at 30–32. Rather, it argues that the hearing officer correctly concluded that DCPS did what it could to address A.T.'s truancy. Def.'s Mem. at 30–32. The Court is persuaded that the issue of DCPS's

handling of A.T.'s disability-related truancy cannot be viewed in isolation. Record evidence reveals that A.T.'s attendance issues stemmed, in large part, from his inappropriate placement in diploma-track classes and in a non-self-contained program. In light of that evidence and the fact that DCPS failed to correct either of those problems, the Court concludes that DCPS denied A.T. a FAPE by failing to properly address his attendance issues.

"The IDEA . . . recognizes that the quality of a child's education is inextricably linked to that child's behavior." *Harris v. District of Columbia*, 561 F. Supp. 2d 63, 68 (D.D.C. 2008). Accordingly, regulations implementing the IDEA require that "the IEP team must, in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 34 C.F.R. § 300.324(a)(2)(i). Courts in this jurisdiction have assumed that a student may be denied a FAPE if his educational plan does not contain sufficient interventions to adequately address attendance issues. *See, e.g.*, *Garris v. District of Columbia*, 210 F. Supp. 3d 187, 191–92 (D.D.C. 2016); *Presely v. Friendship Pub. Charter Sch.*, No. 12-0131, 2013 WL 589181, *8–9 (D.D.C. Feb. 7, 2013). However, consistent with the notion that the IDEA does not prescribe one-size-fits-all interventions, these cases provide little indication of when a school district has done enough to attempt to address attendance issues or, conversely, when a school district's efforts were inadequate.

According to school records, A.T. logged 57 absences during the 2015–16 school year, 48 of which were unexcused. *See* Admin. R. at 413. At Woodson, missing a single class results in being marked absent for the day. *See* Lumumba-Umoja Tr., Admin. R. at 1939–40. At the due process hearing, Woodson's special education coordinator testified that on some days A.T. did not come to school at all; on other days, A.T. appeared at school but did not attend certain

classes.  Lumumba-Umoja Tr. at 1940.  Several times during the school year, Ms. Middleton, through her representatives, asked officials at Woodson to intervene to address A.T.'s attendance issues, arguing that his attendance problems stemmed from a combination of "anxiety and confusion [that] prevent[ed] him from getting to class," Admin. R. at 136, and that A.T. had not attended certain classes because of "distress . . . because he cannot understand what is happening in the classes."  Admin. R. at 174.

The record shows that during meetings on October 19, 2015; February 9, 2016; and April 29, 2016, A.T.'s IEP Team discussed his attendance issues.  *See* Lumumba-Umoja Tr., Admin. R. at 1941–42, *see also* Admin. R. at 377, 504–05, 552.  In addition, in April 2016, Woodson developed a Behavior Intervention Plan for A.T.  Admin. R. at 541.  A Functional Behavior Assessment conducted at the same time specifically identified the environmental conditions that seemed to be affecting A.T.'s behavior.  Admin. R. at 536.  According to that assessment, A.T. was "more likely to engage in the off-task/resistant behaviors when he d[id] not understand an assignment, when he d[id] not have a relationship with the staff or if there [were] too many students in the class."  Admin. R. at 536.  Similarly, the assessment noted that "[w]hen there [was] either a large class or a staff that he ha[d] little rapport with, [A.T] w[ould] frequently cut the class" and "hide[] somewhere in the school" or "seek out support staff (i.e. social worker, school psychologist)."  Admin. R. at 536.

DCPS did not completely sit on its proverbial hands when faced with A.T.'s attendance issues.  To combat A.T.'s academic disengagement, the Behavioral Intervention Plan specified that he would "report directly to the [s]ocial [w]orker or [s]chool [p]sychologist when faced with feelings of anxiety about going to class."  Admin. R. at 545.  In line with this plan, the school psychologist testified that she periodically walked A.T. to his first period course, and that A.T.

48

would often report to her when he did not want to go to class. Testimony of Theodora Jackson ("Jackson Tr."), Admin. R. at 1514. She testified that she talked with him about his hang ups and helped him to decide how to handle the situation. Jackson Tr., Admin. R. at 1513–14. But, in the Court's view, these and DCPS's few other interventions were insufficient under the circumstances. The school district either knew or reasonably should have known that A.T.'s issues stemmed from his inappropriate placement. Indeed, Ms. Middleton's educational advocate suggested as much early in the school year and repeatedly as the year progressed. *See, e.g.*, Admin. R. at 153–62 (emails expressing concerns about A.T.'s programming and attendance issues). And DCPS's own assessment of A.T. revealed that his resistance to attending some classes stemmed, in large part, from his inability to understand his assignments and from the size of his classes. *See* Admin. R. at 536.

Again, the Court will not attempt to disentangle the problem of A.T.'s inappropriate placement from his issues with attendance; they are clearly linked. Because a preponderance of the evidence shows that DCPS's behavioral interventions were insufficient under the circumstances, the Court accordingly concludes that DCPS violated the IDEA and denied A.T. a FAPE.

### E.  Observation by Parent's Educational Advocate

Ms. Middleton next argues that the hearing officer erred in finding no denial of FAPE based on DCPS's refusal to permit Ms. Middleton's educational advocate to conduct an in-class observation of A.T. unless she signed a confidentiality agreement. *See* Pl.'s Mem. at 31–35. The Court agrees with Ms. Middleton that the hearing officer erred. DCPS impermissibly conditioned the educational advocate's observation, in at least some respects. In so doing, it denied Ms. Middleton's participation rights and thereby denied A.T. a FAPE.

The Special Education Student Rights Act of 2014 requires the District of Columbia's local education agencies to permit parents or their designees to observe a child's current or proposed special education program. D.C. Code § 38-2571.03(5)(A). To qualify, a designee must have "professional expertise in the area of special education being observed" or must be "necessary to facilitate an observation for a parent with a disability or to provide language translation assistance to a parent." *Id.* § 38-2571.03(5)(A)(ii). However, the right-to-observe provision does not apply to a designee that is representing the parent's child in litigation related to the provision of a FAPE for that child or to a designee who has a financial interest in the outcome of such litigation. *Id.* The agency "shall not impose any conditions or restrictions on such observations except those necessary to: (i) [e]nsure the safety of the children in a program; [ii] [p]rotect other children in the program from disclosure by an observer of confidential and personally identifiable information in the event such information is obtained in the course of an observation by a parent or a designee; or [iii] [a]void any potential disruption arising from multiple observations occurring in a classroom simultaneously." *Id.* § 38-2571.03(5)(D).

Seeking to observe A.T. in his classroom setting, Ms. Middleton's educational advocate, Dr. Holman, wrote to Woodson's special education coordinator to schedule a visit. *See* Letter from Dr. Holman to Ms. Lumumba-Umoja (Nov. 9, 2015), Admin. R. at 140. In her reply, the coordinator explained that DCPS requires prospective observers to sign a "Classroom Observer Confidentiality Agreement" and to identify the focus of the proposed observation. *See* Admin. R. at 141, 144. Insisting that the form included "many conditions/restrictions simply not permitted under the law," Dr. Holman refused to sign the Agreement. *See* Admin. R. at 150–51. An attorney for DCPS suggested that Dr. Holman could sign the form, indicate that she did so "under protest," and "specify" which conditions she regarded as inconsistent with the law,

explaining that doing so might avoid further delaying her observation. Admin. R. at 149–50. Dr. Holman declined, reiterating her position that the Agreement "impose[d] conditions on the parent's right to designate an observer that are illegal." Admin. R. at 148. Dr. Holman offered no further clarity regarding which provisions she found objectionable and also did not provide any additional information identifying the focus of her proposed observation. *See* Admin. R. at 148.

In Ms. Middleton's due process complaint, she argued that DCPS had denied A.T. a FAPE by preventing his parent's expert from observing him in his current placement. *See* Admin. R. at 655–57. The hearing officer disagreed, concluding that while "DCPS did not need to be as obstructionist as it was," Ms. Middleton had not demonstrated that the observation could not have taken place if Dr. Holman had signed the Agreement and had simply "marked out" any objectionable language in it. HOD, Admin. R. at 31. The hearing officer further observed that "at least a good portion" of the provisions were "clearly" lawful, and noted that, based on his review on the form, he could not ascertain which provisions Dr. Holman regarded as objectionable. HOD, Admin. R. at 28–29.

The Court agrees with Ms. Middleton that the hearing officer's conclusion was error. DCPS did not afford Dr. Holman the opportunity to "mark[] out" provisions of the confidentiality agreement, as the hearing officer concluded. Rather, DCPS encouraged Dr. Holman to sign the form "under protest" and to "specify" the provisions with which she took issue. *See* Admin. R. at 149–50. These instructions provided no clarity regarding whether Dr. Holman was still, despite her protest, expected to abide by provisions that she identified as objectionable. And the Court further agrees that the offer to "specify" does not read like an offer to negotiate the terms of Dr. Holman's visit.

Having found that the confidentiality agreement included actual restrictions and not simply terms that Dr. Holman could mark out or negotiate, the Court next considers whether the restrictions complied with District of Columbia law. The hearing officer made no determination regarding which provisions were acceptable and which were unduly restrictive (if any). This Court need not and will not examine each provision. It suffices to note that one provision is obviously unlawful, and one unlawful provision is one too many. Specifically, one provision of the confidentiality agreement required Dr. Holman to "agree that [she] w[ould] not attempt to engage with . . . school personnel during [her] observation unless previously scheduled and agreed to by the Principal and parent of child." Admin. R. at 146. It is readily apparent that this provision bears no connection to securing the safety of the children, preserving confidentiality, or avoiding the disruption arising from multiple observations. It therefore does not conform to D.C. Code § 38-2571.03(5)(A). The Court further concludes that this unlawful conditioning of Dr. Holman's observation significantly impeded Ms. Middleton's opportunity to participate in the decisionmaking process regarding the provision of a FAPE to A.T. and, therefore, denied A.T. a FAPE. *See* 34 C.F.R. § 300.513(a)(2).

### F. Appropriateness of A.T.'s February 2016 IEP

Ms. Middleton also challenges the appropriateness of A.T.'s February 2016 IEP, asserting that A.T. was denied a FAPE because the IEP (1) improperly continued his placement on the diploma track, (2) featured academic goals unsuitable for A.T., (3) included a post-secondary transition plan that was not based on assessment of A.T.'s abilities and that contained unduly vague goals, and (4) failed to adequately identify A.T.'s least restrictive environment. The Court agrees that DCPS denied A.T. a FAPE by continuing his placement on the diploma track without affording his parent an opportunity to participate in the decisionmaking process

and by including some goals unsuitable for his needs and circumstances. However, the Court concludes that A.T.'s February 2016 IEP was otherwise appropriate.

### 1. Diploma Track

Just as Ms. Middleton challenged A.T.'s initial placement on the diploma track in his April 2015 IEP, she challenges his continued placement on that track in his February 2016 IEP. Pl.'s Mem. at 36–37. The Court finds a violation of the IDEA and a denial of FAPE because DCPS significantly impeded Ms. Middleton's right to participate in the placement decision.[8]

Though Ms. Middleton and Dr. Holman attended the February 2016 IEP meeting, there is no indication that the IEP Team discussed in any significant detail A.T.'s placement on either the certificate or diploma track. Dr. Holman testified that no one brought up the track decision nor discussed whether the certificate track might be appropriate for A.T. *See* Holman Tr. Admin. R. at 1388–90. No other evidence on record indicates that Ms. Middleton received all of the information required by a written notice of proposed placement. *See* 34 C.F.R. § 300.503(a) (describing the notice requirements). As the Court explained in detail above, "a child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor be abridged because the district's behavior did not rise to the level of slothfulness or bad faith." *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996). Here, Ms. Middleton's right to participate in the placement decision was substantially impeded by DCPS's failures to follow procedural requirements. *Cf. N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 70 (D.D.C. 2010) (observing that "failures to include required information in an IEP about the services to be

---

[8] Had DCPS discharged its obligations to fully inform Ms. Middleton at the time that the placement decision was initially made, the Court would likely view this challenge to A.T.'s continued placement differently.

provided a disabled student" are more significant than failures to meet statutory deadlines and the like). Accordingly, the Court agrees with Ms. Middleton that the hearing officer erred and that A.T. was denied a FAPE.

## 2. Annual Goals

Next, Ms. Middleton questions the academic goals listed on A.T.'s February 2016 IEP. She asserts that the goals were not significantly different from the goals listed on his prior IEP, were unduly vague, and were not appropriate for A.T.'s level of performance. Pl.'s Mem. at 37–38. The Court concludes that Ms. Middleton has demonstrated that some of A.T.'s goals were inappropriate, but, as explained below, others were reasonably calculated to enable A.T. to make progress in light of his circumstances.

A.T.'s February 2016 IEP included mathematics, reading, and writing goals. Specifically, A.T.'s mathematics goals were to (1) perform the order of operations on word problems, to "determine measures of central tendency," and to "perform the order of operations on polynomials." IEP 2/9/2016, Admin. R. at 464. A.T.'s reading goals were to "identify the plot in a literary story and supporting details," to "identify the major characters in a narrative text," and to "utilize graphic organizers in order to identify chronological events of a story with supporting details." IEP 2/9/2016, Admin. R. at 466. Finally, A.T.'s writing goals were to "employ the requirements for writing a sentence by using correct spelling, punctuation, grammar, and mechanics," to "prepare a well developed one paragraph summary," and to "perform self-editing/peer review." IEP 2/9/2016, Admin. R. at 468.

The Court need not belabor its analysis, as some of the challenges to A.T.'s February 2016 IEP goals overlap with the challenges to his April 2015 IEP goals. The Court easily rejects Ms. Middleton's first two arguments. A comparison of A.T.'s April 2015 and February 2016

IEPs reveals substantially different goals, thus, the Court disagrees that DCPS may have simply carried over A.T.'s past IEP goals.  Indeed, Ms. Middleton herself notes that the goals were updated to reflect 8th and 9th grade, rather than 7th grade common core standards.  Second, the Court disagrees that these goals were unduly vague.  Though broad, each goal is specific and clear enough to satisfy the IDEA.

As for Ms. Middleton's final complaint, the Court agrees in part with Ms. Middleton's assertion that some of the goals were inappropriate for A.T.'s needs and abilities.  Specifically, given A.T.'s reading and mathematics deficits, the record shows that the relevant goals were not tailored to A.T.'s needs or designed to confer educational benefit.  However, some of A.T.'s writing goals appear to be appropriate.  For example, the IEP included a goal of working toward writing a full sentence.  R. at 468.  But others were inappropriate—for example, the goal of participating in self- and peer-editing on written assignments is not sufficiently tailored to the needs and circumstances of a student who is in the process of learning to read and write.  Thus, the Court agrees in part with both parties and finds a partial violation of the IDEA.

### 3.  Post-Secondary Transition Plan

Ms. Middleton argues that the post-secondary transition plan in A.T.'s February 2016 "suffers from the same issues" as the April 2015 plan.  Pl.'s Mem. at 38.  Namely, according to Ms. Middleton, the plan did not appropriately take into account A.T.'s skills and abilities because it was not based on inappropriate assessments.  Pl.'s Mem. at 38–39.  DCPS disagrees, asserting that the transition plan was based on appropriate assessments.  Def.'s Mem. at 18–19.  The hearing officer found no violation of the IDEA, concluding based on record testimony that the assessments conducted were age appropriate, that no further assessments were required, and that A.T.'s transition plan was reasonably calculated to enable him to receive educational benefit.

HOD, Admin. R. at 32.  Based on the record before the Court, the Court finds no violation of the IDEA and no denial of FAPE with respect to this transition plan.

The transition plan featured in A.T.'s February 2016 IEP was based on three assessments—(1) "What's Your Learning Style?," (2) the "Job Related Interest Inventory," and (3) "Independent Living Assessment."  *See* Def.'s Mem. at 18; Admin. R. at 880–85.  The first assessment features questions that assist a student in understanding how he or she prefers to learn and to approach new information.  *See* Admin. R. at 880–81.  The second assessment features questions about a student's job-related interests and preferences, including, for example, whether the student prefers to work alone or with others.  *See* Admin. R. at 882–83.  And the final assessment states that it is designed "[t]o discriminate ability for safe independent living within an apartment setting."  Admin. R. at 884.  At the due process hearing, Mr. Nace, an expert in transition planning, testified that the assessments were appropriate for A.T.'s age.  Nace Tr., Admin. R. at 1893.  He explained that, as a ninth-grade student, A.T. was still in the "exploration" phase of transition planning when his February 2016 IEP was developed.  Nace Tr., Admin. R. at 1892–93.  According to Mr. Nace, the transition plan for a ninth-grade student should "focus on exploration . . . regardless of [the student's] functioning level."  Nace Tr., Admin. R. at 1892–93.  In seeking to undermine Mr. Nace's contentions, Ms. Middleton argues that none of the assessments focused on A.T.'s skills and abilities.  *See* Pl.'s Mem. at 38–40.  Ms. Middleton also notes that A.T.'s transition plan did not mention his inability to read, his difficulties navigating, and other disability-related weaknesses that might prevent him from achieving his goals.  Pl.'s Mem. at 39.

Though the Court is sympathetic to Ms. Middleton's position that A.T.'s transition plan would have been better if it had been based on additional, skills-related assessments, the Court

finds no violation of the IDEA based on DCPS's failure to conduct such assessments. Mr. Nace testified that at A.T.'s age, assessments focus primarily on exploration. *See* Nace Tr., Admin. R. at 1892–93. Ms. Middleton does not dispute that the assessments that were conducted might help a student to determine his or her interests, and she points to no evidence in the record undermining the notion that, at A.T.'s age, this sort of assessment suffices. Accordingly, the Court cannot say that the hearing officer wrongly concluded that the assessments were age-appropriate and sufficient.

As for Ms. Middleton's contention that the goals featured on A.T.'s transition plan were too vague and were inappropriate given A.T.'s skills and abilities, Ms. Middleton has failed to identify any procedural or substantive inadequacy in the plan that violates the IDEA. That A.T.'s long-term goals were somewhat broad reveals no infirmity in the plan, especially in light of Mr. Nace's contentions that, at A.T.'s age, schools generally focus students on exploring possible career interests. Mr. Nace explained that, at this stage, "typically [transition goals] [are] broader because a student has no clue really, the student has no clue because it's the first time they are ever even talking about the concept of transition and so it wouldn't be fair to put specific things in there when the student really doesn't know." Nace Tr., Admin. R. at 1897–98. And Ms. Middleton asserts that A.T. could not meet his short-term goals—which included using the internet to identify job training programs and brainstorming two or three careers of interest to him. Pl.'s Mem. at 39. However, she ignores that, with respect to his research concerning job training programs, the IEP explicitly noted he would conduct the research with the assistance of his case manager. 2/9/2016 IEP, Admin. R. at 478. Ms. Middleton offers no evidence for the claim that A.T. could not be expected to identify other careers of interest to him and the

requirements for those careers.  In sum, the Court finds no violation of the IDEA with respect to A.T.'s February 2016 post-secondary transition plan.

### 4. Least Restrictive Environment

The hearing officer found that A.T.'s February 2016 IEP adequately described his least restrictive environment and that any lack of additional specificity constituted a procedural violation, but not a substantive one.  Admin. R. at 32.  Ms. Middleton argues that this was error. She contends that the IEP did not include essential information about A.T.'s placement in the SLS program at Woodson.  She further contends that because this information was not listed and not specifically discussed at the IEP meeting, she had no information about A.T.'s specific program placement.  Pl.'s Mem. at 38.  The Court disagrees with Ms. Middleton.

In *Brown v. District of Columbia*, 179 F. Supp. 3d 15 (D.D.C. 2016), one court in this jurisdiction concluded that "given the emphasis the IDEA places on the concept of an LRE and the central role the IEP plays in the broader statutory framework, . . . an IEP team is required to discuss a student's specific LRE and the IEP is required to include at least a brief description of it."  *Id.* at 27.  The court explained that, "[i]f that were not the case, it would be very difficult to ensure that the IEP 'enables the child to achieve passing marks and advance from grade to grade in the least restrict environment possible."  *Id.* (quoting *Dixon v. District of Columbia*, 83 F. Supp. 3d 223, 232 (D.D.C. 2015)).  In that case, the student's IEP listed only the number of hours of specialized instruction and behavioral support services that the student would receive and noted that the student required "intense remediation in all areas."  *Brown*, 179 F. Supp. 3d at 19.  The Court concluded that "the school district's failure to fully discuss the LRE at the IEP meeting or describe it on the IEP itself effectively deprived plaintiff of the opportunity 'to

understand what services will be provided and make a determination about whether the proposed placement is adequate.'" *Id.* at 28 (quoting *Stein*, 709 F. Supp. 2d at 70).

A.T.'s February 2016 IEP supplied substantially more detail about the student's LRE than the one in *Brown*. A.T.'s IEP provided that he has "significant math and reading deficits and severe memory retention problems that require small group or one-on-one instruction, significant modifications and differentiation in order to access learning materials." Admin. R. at 473. Furthermore, the IEP noted that A.T. had "significant language and communication deficits that affect both his academic learning and social skills." Admin. R. at 473. The Court agrees with the hearing officer that this description certainly could have been more thorough. However, it disagrees with Ms. Middleton that A.T. was denied a FAPE based on any inadequacies in the description of A.T.'s LRE. As written, the IEP explained that A.T. must receive small group or one-on-one instruction and modifications, which was—for the most part, at least—the type of programming A.T. received at Woodson in the SLS program. *See* IEP 2/9/2016, Admin. R. at 449. Though the program was not cited by name, the record shows that Ms. Middleton was aware of the type of instruction A.T. had been receiving. Indeed, Dr. Holman's several emails detailed the type of instruction and asked that A.T. be placed in an even more restrictive environment. Under these circumstances, the Court concludes that, unlike the plaintiff in *Brown*, Ms. Middleton was not precluded from participating in the placement process as a result of any deficiencies in the description of her child's LRE. Thus, any deficiencies with respect to this issue were not material.

\*\*\*

With respect to A.T.'s February 2016 IEP, the Court concludes that DCPS violated the IDEA and denied A.T. a FAPE when it continued the diploma track placement without

complying with important procedural requirements that promote parental participation in educational placement decisions and based on its inclusion of inappropriate academic goals on his IEP.  However, the Court finds no error in the IHO's determination that the IEP contained an appropriate post-secondary transition plan and an adequate description of A.T.'s LRE.

### G.  Relief

Having concluded that the preponderance of the evidence shows that DCPS violated the IDEA and denied A.T. a FAPE, the Court next considers Ms. Middleton's request for relief.  Ms. Middleton asks for compensatory relief for any denials of FAPE for which she has not already been compensated.  Compl. at 35–36.  She also requests an order specifying that A.T. requires an IEP and corresponding placement and programming that includes (1) a minimum of 32 hours per week of specialized instruction outside of the general education setting; (2) placement on the certificate track and in small-group programming that focuses on functional/daily living skills and vocational training; (3) a "results-oriented, realistic, and appropriate post-secondary transition plan" based on comprehensive assessments.  Compl. at 36.

The Court concludes that remand to the hearing officer is in order in this case.  The D.C. Circuit has held that a district court may remand for the purposes of considering an award of compensatory education following a finding that a child was denied a FAPE.  *See Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 526 (D.C. Cir. 2005); *see also Branham ex rel. Branham v. Gov't of D.C.*, 427 F.3d 7, 13 (D.C. Cir. 2005) (holding that "*Reid* permits the district court to either take supplemental evidence or to return the case to the hearing officer").  And district courts in this jurisdiction frequently remand for such a determination.  *See, e.g.*, *Wilson v. District of Columbia*, 770 F. Supp. 2d 270, 277 (D.D.C. 2011); *Walker v. District of Columbia*, 786 F. Supp. 2d 232, 239 (D.D.C. 2011).  Here, remand is appropriate because the

hearing officer is better situated than this Court to take additional evidence, to make further factual findings, and to evaluate A.T.'s current educational needs in designing the appropriate relief.  Accordingly, the Court remands this case to the hearing officer with instructions to "craft an award that 'aim[s] to place [A.T.] in the same place [he] would have occupied but for the school district's violations of [the] IDEA.'"  *Henry v. District of Columbia*, 750 F. Supp. 2d 94, 99 (D.D.C. 2010) (quoting *Reid*, 401 F.3d at 518).

## V.  CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Ms. Middleton's motion for summary judgment , and also grants in part and denies in part the District's motion for summary judgment.  This case is remanded for further proceedings consistent with this Opinion and for a determination of the appropriate relief.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 4, 2018                                     RUDOLPH CONTRERAS
                                                                         United States District Judge